**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
Correy A. Kamin
Matthew M. Guiney
270 Madison Avenue
New York, New York 10016
Tel.: (212) 545-4600
Fax: (212) 686-0114
kamin@whafh.com
guiney@whafh.com

*Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NAYMISH PATEL, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ZOOMPASS HOLDINGS, INC., ROBERT LEE, and BRIAN MORALES, <br><br> Defendants. | Civil Action No. 2:17-cv-03831-JLL-JAD <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Court-appointed Lead Plaintiff Carlos Guillermo Julian Vega ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zoompass Holdings, Inc. ("Zoompass" or the "Company"), and information readily available on the Internet. Plaintiff

believes that additional substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired Zoompass common stock between April 24, 2017 and May 24, 2017, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Zoompass purportedly develops a mobile money platform that enables brands to transform their financial interactions with customers.  The Company also offers mobile money solutions that include international and domestic money transfers, contractor payments, direct payroll deposit, merchant payments, and bill payments.

3.     As alleged in detail below, defendants Zoompass, Robert Lee, and Brian Morales (together, "Defendants") engaged in a fraudulent and manipulative scheme to inflate the price of the Company's common stock while concealing their involvement in the promotional scheme from investors.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Zoompass unlawfully engaged in a scheme to promote the Company's stock; (ii) Zoompass failed to disclose that its internal controls were inadequate and that discovery of the foregoing conduct would subject the Company to heightened regulatory scrutiny and potential criminal sanctions;

and (iii) as a result of the foregoing, Zoompass' public statements were materially false and misleading at all relevant times, causing Zoompass stock to trade at artificially inflated prices.

5.     On May 9, 2017, Zoompass disclosed that it had been "made aware of and requested by the OTC Markets Group, Inc. to comment on recent trading and promotional activity."

6.     Following this announcement, shares of Zoompass fell from $3.64 per share on May 9, 2017, to a closing price of $1.97 on May 12, 2017 – a nearly 50% drop in only three trading days.

7.     On May 25, 2017, *Seeking Alpha* published an article revealing that the Defendants had misleadingly denied their involvement in a scheme to promote the Company's stock, and that the Defendants had intentionally concealed Defendant Lee's involvement in the scheme.

8.     On this news, shares of Zoompass fell another $0.70 (over 23%) to close at $2.25 per share on May 25, 2017, and subsequently dropped below $1 per share where the stock continues to trade as of the filing of this complaint.

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other members of the Class have suffered significant losses and damages.

## JURISDICTION & VENUE

10.     The federal claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District, and Zoompass' U.S. offices are located within this District.

14.     In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff purchased Zoompass securities during the Class Period at artificially inflated prices as set forth in the certification on file with the Court.

16.     Defendant Zoompass is a Nevada corporation headquartered in Toronto, Canada, with its principal executive offices located at 107 Atlantic Avenue, Suite 201, Toronto, ON M6K 1Y2, Canada.  The Company's U.S. offices are located at 96 Engle Street, Suite #1, Englewood, NJ 07631.  Zoompass common stock trades, under the ticker symbol "ZPAS," on the "Venture Market" (the "OTCQB"), a financial market "[f]or early-stage and developing U.S. and international companies," and one of three financial markets organized by the OTC Markets Group, Inc. ("OTC Markets").

4

17.     Defendant Robert Lee ("Lee") has served as a director and the Chief Executive Officer ("CEO") of Zoompass since August 2016.  Mr. Lee has also served as a director of Pura Naturals, Inc. ("Pura Naturals") since April 2016.   According to the Company's Annual Report filed on Form 10-K with the SEC for the 2016 fiscal year (the "2016 Form 10-K"), as of April 18, 2017, Mr. Lee was the beneficial owner of 15,210,668 shares of Zoompass common stock, representing approximately 38.1% of the shares issued and outstanding at that time.

18.     Defendant Brian Morales ("Morales") has served as the Company's Chief Financial Officer ("CFO") since August 2016.

19.     Defendants Lee and Morales are together referred to herein as the "Individual Defendants."

20.     Each of the Individual Defendants: (a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was privy to confidential proprietary information concerning the Company and its business and operations; (d) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) was aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning the Company; and/or (g) approved or ratified these statements in violation of the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

21.     Zoompass is a financial services technology company that purportedly provides a financial platform that aims to supply businesses and governments with tailored solutions to help

5

digitize their financial transactions.  The Company also offers physical prepaid cards, financing enablement, and mobility products solutions.

22.     Zoompass was formerly known as UVIC, Inc. ("UVIC"), which was incorporated in Nevada on August 21, 2013.

23.     On November 28, 2014, UVIC issued 7,000,000 shares of common stock at $0.001 per share for total proceeds of $7,000.   The shares were issued to Iuldashkhan Umurzakov ("Umurzakov"), UVIC's sole officer and director at the time.

24.     On May 8, 2015, UVIC filed a registration statement with the SEC on Form S-1 to register the 7,000,000 shares of common stock at a per share price of $0.01 on behalf of selling shareholders. The SEC file number of the registration statement is 333-203997. The Form S-1 was declared effective by the SEC on August 7, 2015.

25.     As of June 30, 2015, UVIC's total assets were just $6,780 compared to $6,157 in total assets at September 30, 2014.   Total assets were comprised of $4,130 in cash, $500 in prepaid expenses, $250 in security deposit and $1,900 in equipment. As of June 30, 2015, the current liabilities were $4,621, comprised of $4,621 in loan from a shareholder.

26.     As of September 2015, UVIC reported that there was "substantial doubt about the Company's ability to continue as a going concern."   Management believed that UVIC's "capital requirements will depend on many factors including the success of the Company's development efforts and its efforts to raise capital."

27.     Upon information and belief, Defendant Lee acquired the 7,000,000 shares of common stock initially issued to Umurzakov between June 2015 and June 2016.

28.     Zoompass was incorporated under the laws of Ontario on June 8, 2016.

6

29.     Shortly thereafter, on August 22, 2016, Zoompass entered into a stock exchange agreement with UVIC, pursuant to which UVIC agreed to issue 8,060,913 shares of its restricted common stock to Zoompass shareholders in exchange for all of the shares of Zoompass.  As a result, Zoompass became a wholly-owned subsidiary of UVIC.

30.     According to publicly-filed documents with the SEC, "at the Closing Date, [Defendant] Rob Lee, a significant shareholder of UVIC agreed to cancel 7,000,000 shares of UVIC's common stock, which shares constituted the control shares of the Company.  Other than this one significant shareholder, shareholders of the Company held 2,670,000 shares. As a result of the Agreement, Zoompass is now a wholly owned subsidiary of the Company."

31.     Also as of August 22, 2016, Mr. Umurzakov was not re-elected as an officer of the Company.  On that date, Defendant Lee was appointed as CEO and Director, Defendant Morales was appointed as CFO, and Steve Roberts, Ted Yew and Jon Tondeur were appointed as directors.

32.     On August 24, 2016, the Company completed a non-brokered offering of 233,331 shares, which reflected a forward split, at $1.16 per common stock (C$1.50 per common stock) for aggregate gross proceeds of $270,479 (C$350,000).

33.     On September 7, 2016, the Company received approval to change its name from UVIC to Zoompass and to approve a forward split of 3.5 for 1, and it increased authorized shares to 500 million.

34.     On October 12, 2016, the Company issued 1,129,711 shares through the exercise of 1,129,711 share purchase warrants raising gross proceeds of $427,985 (C$537,601).

35.     On October 31, 2016, the Company filed amended articles of incorporation in Delaware reflecting the stock split and name change.

36.    On December 15, 2016, the Company completed a non-brokered offering of 379,921 shares at $1.12 per common stock (C$1.50 per common stock) for net proceeds of $401,285, net of a financing fee of $24,096.

37.    On December 1, 2016, the Company issued 1,480,000 common stock purchase options at an exercise price of C$1.50 to directors, officers, employees and consultants of the Company.  Of these options, 562,500 vested immediately and were exercisable for five years from the grant date.  The remaining 917,500 options were exercisable for five years from the grant date at an exercise price of C$1.50 and vested ratably over a three year period from the date of grant.

38.    Other public filings indicate that, on December 1, 2016, the Company issued 460,000 deferred stock units to directors, officers, employees and consultants of the Company, which have a life of five years from date of grant.  187,500 vested immediately and were to be exercised by the recipient.  Settlement of the deferred stock units may be in cash or common stock of the Company, at the option of the Company.

39.    On January 26, 2017, the Financial Industry Regulatory Authority, Inc. ("FINRA") approved the proposed company name change and, on February 16, 2017, FINRA approved the stock split.  Thereafter, Company stock was permitted to trade with a "D" after its ticker, indicating a "new issue" security.

40.    Also on February 16, 2017, the name change and stock split became effective following compliance with FINRA regulations.

41.    As the Company embarked on a renewed business and began public trading, its business model was reportedly as follows:

> Zoompass is a leading financial services technology company with a unique place in the Fintech space as both a financial platform provider with divisions in

physical prepaid cards, financing enablement, and mobility products. Zoompass provides businesses and government tailored solutions to help digitize their financial transactions. In the card sector, Zoompass offers complete program management services for a wide range of open loop Visa and MasterCard prepaid and virtual card accounts. Zoompass enables businesses to provide their customers with a number of open loop card choices including, gift card, incentive cards, check replacement cards and online virtual card accounts. The company also provides advanced mobile technology, enabling businesses to provide their customers with a white label mobile wallet solution, like Zoompass, with the ability to manage their card balances, bill pay, transfer funds and perform card to card money transfers in real time using their mobile devices. Zoompass's mobile device division helps carriers and mobile device manufacturers integrate the financial platform technology into their offerings.

42.     On March 1, 2017, the Company's Twitter page sprang to life after five years of dormancy.   The Company's first "Tweet" since February of 2012 touted "online purchases without a credit card" as follows:



43.     Two days later, on March 3, 2017, Zoompass announced that it would be "launching its enhanced Mobile Money Platform during March 2017."  The Company also announced that it had agreed to various "marketing partnerships" with several other companies, but failed to provide any specifics associated with the "partnerships."

44.     On March 27, 2017, the Company announced that it "intended to work together" with First Global Data on a "variety of initiatives."  On the same day, according to Yahoo! Finance, Zoompass stock began actively trading, as set forth in the chart below (with the box on the top left illustrating March 27, 2017 prices and volume):



45.     On or about April 10, 2017, *Currin Technology* issued a "special high-tech issue" of its "Wall Street Investor" publication (the "Promotional Newsletter"), which is attached hereto as Exhibit A.  While creating the pretense of disseminating news related to the financial

technology sector, the Promotional Newsletter was, instead, a glowing advertisement for Zoompass.

46.     A "report" entitled "Billionaire Bill Gates Investing Heavily in Mobile Banking," for example, states: "Rick Currin shares Bill Gates' opinion about the future of mobile banking – and has identified **Zoompass (OTC: ZPAS)** as the single best way for individual investors to tap into this massive trend."   (Emphasis in original).   This claim, which appears immediately underneath a large color picture of Bill and Melinda Gates, misleadingly suggests that Bill Gates had recommended an investment in Zoompass.

47.     In addition to this propaganda, the Promotional Newsletter was full of colorful pictures and flashy graphics touting the Company's alleged ability to generate "millions in revenue" and, even based on conservative projections, deliver investors "a potential 60.4% gain."



Graphics like the bar chart above suggest that "Zoompass could help investors turn every $5,000 invested in $18,475 – or more."

48.     The Promotional Newsletter went so far as to describe Zoompass as "one of the most attractive tech stocks I've discovered in the last 15 years.  The potential exists for ***triple-digit growth***, allowing investors to take advantage of this 'gift' to the tune of 270% profits or

11

more!" (Emphasis added.)  Rick Currin even advised investors: "***I believe Zoompass can do as***

***well – or even better – than many of the triple-digit winners*** [such as Google, Apple, and

Nokia] my subscribers have already cashed in!"  (Emphasis added.)

49.     The circulation of the Promotional Newsletter and dissemination of the related

website (zoompassinvestor.com) corresponded to a three-week meteoric rise in the Company's

share price as set forth in the chart below (the box on the upper left illustrating trading prices and

volume as of April 10, 2017).

50.     Specifically, from April 10 through May 9, the closing price of Company shares

skyrocketed from $1.80 per share to $3.64 per share – an increase of more than 200% in just

under one month.



51.     Like the Promotional Newsletter, zoompassinvestor.com (the "Promotional

Website") compared Zoompass to powerhouse companies like Amazon, Netflix, and Apple,

arguing that Zoompass investors could cash in on a predicted "massive, permanent change in consumer behavior."



52.   Predicting the impending extinction of "brick-and-mortar" banks, Rick Currin explicitly stated that he had "talked to the company's management" before proclaiming that "[o]ver the next several months, **Zoompass (OTCBB: ZPAS)** stands poised to potentially grow at a rapid rate."  (Emphasis in original.)



53.     Indeed, the Promotional Website claimed that "many large banking institutions are looking to form alliances with **Zoompass (OTCBB: ZPAS)**—because they know their very survival depends on it!"  (Emphasis in original.)   The predicted rapid growth of Zoompass, according to the Promotional Website, "could translate to rapid profits for investors."



54.     Meanwhile, on April 18, 2017, the Company announced that it was "in the process of completing a series of private placements with accredited investors, through the subscription of common shares" raising approximately C$250,000.  The Company reported that in April 2017, through a series of private placements, the Company completed several subscriptions for the issuance of non-registered common shares for gross proceeds of C$234,000 through the issuance of 131,959 common shares.

## The Class Period Begins

55.     The SEC recently warned of the potential for fraud in connection with microcap stocks – low-priced stocks issued by the smallest of companies:

Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows.  Paid promoters are generally behind the unsolicited "junk" faxes, e-mail messages, or high-end glossy mailers you may receive, touting a microcap company.  The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.

https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html

56.     The SEC's publication looks prophetic in light of the facts alleged herein.  In short, the Defendants were involved in a scheme during the Class Period to make hidden payments to stock promoters in order to pump up the prices of Zoompass stock, defrauding investors.

57.     The Company's stock promotion scheme was connected to, among others, Creative Direct Marketing Group, Inc. ("CDMG"), an advertising agency that ran the website zoompassinvestor.com described above during the Class Period.  The scheme also involved the dissemination of the Promotional Newsletter.

58.     The Class Period begins on April 24, 2017, when Zoompass filed its 2016 Form 10-K, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016.  In relevant part, the 2016 Form 10-K advised investors that the Company "***did not have any promoters at any time during the past five fiscal years***." (Emphasis added).

59.     The 2016 Form 10-K also stated that the CEO and CFO had evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures.

60.     The 2016 Form 10-K also stated that "the price of our common stock may be negatively impacted by factors that are unrelated to our operations."

61.    Defendants Lee and Morales signed the Form 10-K pursuant to the Sarbanes-Oxley Act of 2002.

62.    The following day, trading in Zoompass common stock was nearly 2 million shares, reflecting the largest volume recorded in the Company's very brief trading history.

63.    On April 27, 2017, Zoompass announced that it had agreed to another "partnership" with a company concerning self-serve kiosks.

64.    Zoompass shares continued a steady rise through May 8, 2017, when the Company announced that it "expected to receive commissions through an initial purchase order" under a program for delivery of mobility products.  The Company also announced the delivery of 50,000 prepaid cards to "select retail locations."

65.    But that same day, unbeknownst to shareholders, OTC Markets informed the Company that it had become aware of the Promotional Newsletter touting the Company and encouraging investors to purchase the Company's common stock.

66.    As a consequence, Zoompass shares were labeled as "caveat emptor" as follows:

 **Zoompass Holdings, Inc.** 

Current Information

Common Stock

Buyer Beware. There is a public interest concern associated with the company, which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions.

67.    On May 9, 2017, after the close of the market, Zoompass issued a press release commenting "on recent trading and potential promotional activity concerning ZPAS common stock."  The announcement was vague and circumscribed:

The Company is unaware of the full nature and content of the promotional newsletter and any related promotional activity, the responsible parties and the extent of the email newsletters' dissemination. The Company is not aware of the promotional materials' author or its affiliated entities or persons, other than the identifying information disclosed in the newsletter. The Company's recent press releases have reported on and provided disclosure of legitimate and ongoing corporate activity only, and are not part of any promotional activities or campaign.

68.     Rather than explicitly denying the involvement of the Company or its officers and directors in the promotional scheme, however, Zoompass issued the following vague statement:

After inquiry, the Company states definitively that its officers, directors and, *to the Company's knowledge*, its controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities), of which there are only two, have not, directly or indirectly, authorized or been involved in any way (including payment to a third-party) with the creation or distribution of promotional materials including the subject newsletter; and that the Company, its officers, directors, and *to the knowledge of the Company*, any controlling shareholders, have not sold or purchased the Company's securities within the past 90 days only the open market. Additionally, the shares currently held by the Company's officers, directors and controlling shareholders are not registered.

(Emphasis added).

69.     The Company's controlling shareholders are Defendant Lee (who owns approximately 38.1% of the Company's outstanding stock) and Edward Yew (a director and the Company's corporate secretary, who owns approximately 12.2% of the Company's outstanding stock).   Accordingly, there is no reason that denials of the involvement of controlling shareholders would need to be qualified by the language "to the Company's knowledge" – unless there was something to hide.

70.     Following this disclosure, Zoompass shares fell 45%, or $1.67, over three trading days on the Company's highest trading volume ever recorded.

71.     On May 11, 2017, Zoompass publically announced that OTC Markets had "listed ZPAS common stock on its OTC Pink Current Information, rather than on the OTCQB, and

17

placed the Caveat Emptor symbol on the company profile as a result of the promotional activities

that was disclosed in our Press Release issued May 9, 2017."[1]   The press release also stated as

follows:

> We note that the Caveat Emptor sign does not mean or imply that any public
> information made available by the Company is inaccurate, incomplete or
> insufficient in any way, and is not an opinion or suggestion by the OTC Markets
> or the Company regarding the price of the Company's common stock. We assure
> the public that all of our press releases, SEC filings and information on our
> website (www.zoompass.com) and the OTC markets profile remains true, correct
> and complete. We encourage anyone considering an investment in our securities
> to review our public filings, website and press releases and to not rely on third
> party newsletters/recommendations or general stock symbols/classifications or
> other identifiers regarding our securities, whether positive or negative, as these
> items are simply opinions/policies of a third party and should not be a substitute
> for investors' research and independent decision making process.

72.    Defendants again, however, **did not** deny their involvement with the promotional

activities.  Instead, Defendant Lee stated:

> The Company supports the OTC Markets' policy regarding promotional activities,
> but we also strongly believe that our public disclosures are accurate and complete,
> and that they fully describe our commitment to our business plan and our progress
> in effectuating that business plan.  We believe that any increased market interest
> in our securities in recent weeks is the result of those efforts and disclosures, and
> not materially related to any newsletters that may have been distributed by third
> parties.

73.    Trading volume in Zoompass stock was heavy the following day, when nearly 2.6

million shares were traded, surpassed only by the trading volume of May 10, 2017.

74.    On May 15, 2017, the Company filed a quarterly report for the fiscal period ended

March 31, 2017 on Form 10-Q with the SEC (the "1Q 2017 10-Q"), signed by Defendant Lee.

---

[1] While companies listed on the OTCQB must be current in their reporting and undergo an annual
verification and management certification process, there are no minimum financial standards for
companies to be listed on the OTC Pink Current Information market.  OTC Markets advises potential
investors in companies listed on the OTC Pink Current Information market to "proceed with caution," as
companies listed thereon are not willing or able to provide adequate information to investors.  OTC
Markets may, at its discretion, label a security "Caveat Emptor" if "it has come to the attention of the
OTC Markets that a security has been the subject of promotional activities."

In the 1Q 2017 10-Q, the Company belatedly conceded, albeit opaquely and confusingly, that its internal controls *were not adequate* just weeks after representing that those same controls *were* adequate:

> As of the end of the period covered by this Quarterly Report, the Company carried out an evaluation, under the supervision and with the participation of our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b). Based upon this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures as of the end of the period covered by this Quarterly Report *were ineffective* due to a lack of segregation of duties, due to limited administrative and financial personnel and related resources and as only one of our directors is independent.

(Emphasis added).

75.    Nevertheless, despite the belated revelation, the Individual Defendants failed to disclose: (1) their engagement in the promotional scheme described herein; and (2) any information concerning the findings that the Defendants failed to maintain adequate internal controls.   The Individual Defendants either knew or were reckless in not knowing of the fraudulent promotional scheme.

76.    The 1Q 2017 10-Q also contained Sarbanes-Oxley Act of 2002 certifications signed by Defendants Lee and Morales, attesting to the accuracy of the 1Q 2017 10-Q.   The Sarbanes-Oxley Act of 2002 certifications also attested that the 1Q 2017 10-Q disclosed any material changes to the Company's internal control over financial reporting, and represented that the 1Q 2017 10-Q was a full disclosure, "in all material aspects, [of] the financial condition and results of Zoompass Holdings, Inc."   This statement was false or misleading because of the Individual Defendants' knowledge of the stock promotion scheme.

77.    Zoompass shares slowly began rising again until May 25th, when an explosive article published by the Fraud Research Institute and published on *Seeking Alpha* fully and

finally exposed and outlined the Defendants' involvement in the scheme to make hidden payments to stock promoters to pump up the price of Zoompass stock.  For the first time, the *Seeking Alpha* article made the Company's shareholders aware of the true extent of the fraudulent conduct and scheme at the Company.  A complete copy of the article is attached hereto as Exhibit B.

78.     Plaintiff's counsel has reviewed the underlying documents referenced in the *Seeking Alpha* article.

79.     The article summarized its findings as follows:

**Summary**

- Shares are inflated due in part to an ongoing stock promotion campaign that may end soon
- The company's original corporate name appears in an SEC subpoena related to questionable registration statements.
- OTCMarkets.com has already designated the stock as "Caveat Emptor" aka Buyer Beware.
- The company's CEO has failed to disclose his relationship with another promoted penny stock.

Zoompass Holdings, Inc. (OTCPK:ZPAS) has been one of the top performing and most actively traded micro-cap stocks of 2017. During the past several months, shares of Zoompass have gone from almost complete dormancy to trading millions of shares while increasing in share price by as much as 150%.

However, we believe that the recent move in share price is completely unwarranted and is related to an ongoing stock promotion campaign whereby an advertising budget of nearly $2 million is being spent on a promotional newsletter "touting the Company and encouraging investors to purchase the Company's common stock," as described in a recent press release.

The company was recently designed as "Caveat Emptor" on OTCMarkets.com and its former name, UVIC, Inc., appears in a subpoena issued by the Securities and Exchange Commission related to a number of questionable S-1 registration statements issued by prohibited attorney Adam S. Tracy.

 

ZPAS ▸ **Zoompass Holdings, Inc.**

Common Stock                                   Current Information

Buyer Beware. There is a public interest concern associated with the company, which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions.

For all of the reasons outlined in this report, we believe that shares of Zoompass could fall by at least 56% in the short term.

80.    The *Seeking Alpha* article cast doubt on the recent increase in the Company's market capitalization to nearly $117 million, citing press releases by Zoompass immediately prior to and during the Class Period in arguing that "the main contributor to the stock's recent performance is not the company's recent results but rather an ongoing stock promotion campaign."  The article thus stated further, in relevant part:

> Below we have listed all of the company's announcements made during the past several months. In our opinion, although these press releases occasionally sound upbeat, they fail to reference any specific material numbers that could justify the recent increase in market cap to nearly $117 million:
>
> • Zoompass Virtual Card Program Enables Latin American (LATAM) Consumers Access To US E-Commerce Markets - 5/24/2017
>
> • Zoompass Files First Quarter Results - 5/15/2017
>
> • Zoompass Issues Statement About Its Common Stock OTC Market Listing - 5/11/2017
>
> • Zoompass Issues Statement About Promotional Activity Concerning Its Common Stock - 5/9/2017
>
> • Zoompass Announces Corporate Update - 5/8/2017
>
> • Zoompass Selects UVend Group of Companies as Self Serve Kiosk and Digital Partner - 4/27/2017
>
> • Zoompass Corporate Update - 4/18/2017
>
> • Zoompass Provides Operational and Corporate Update - 3/3/2017
>
> In our opinion, the company's press releases above lack substance. For example, in the company's operational and corporate update, it referenced agreements with SYNNEX Canada Limited, SKY Devices LLC and U-Vend Group, but failed to mention specific terms and conditions.

81.    The *Seeking Alpha* article also revealed that the Company's stock promotion scheme was connected to CDMG, which operated the Zoompass Promotional Website.  The Zoompass Promotional Website, as described above, contained a report by Rick Currin that "is quick to point out industry statistics and million dollar figures relating to 'financial technology' while lacking substance relating to the company's internal business operations."

82.     The Zoompass Promotional Website's disclaimer disclosed that Sargon Finance paid nearly $2 million "for the creation of various elements of this campaign in an effort to build investor awareness" of Zoompass.

83.     The disclaimer further falsely asserted that the Zoompass Promotional Website was "an independent paid circulation newsletter."   The relevant portion of the *Seeking Alpha* article is as follows:

**Volatility Attributed To Stock Promotion**

To date, we have discovered advertisements on Google and Yahoo Finance that direct visitors to a website promoting Zoompass here.

In true promotional form, the website features a glaring report by Editor Rick Currin that is quick to point out industry statistics and million dollar figures relating to "financial technology" while lacking substance relating to the company's internal business operations.

However, the most important dollar amount is buried within the legal disclaimer:

> This online report is a solicitation for subscriptions for the newsletter and a paid promotional advertisement of Zoompass (ZPAS). Zoompass (ZPAS) was chosen to be profiled after Currin Technology completed due diligence on Zoompass (ZPAS). Currin Technology expects to generate new subscriber revenue, the amount of which is unknown at this time, resulting from the distribution of this report. While receiving no direct compensation, and maintaining absolutely no obligation to provide any future views in support of the company highlighted, Currin Technology will receive indirect marketing support consistent with distribution of the report and will likely acquire new subscribers, the amount of which is not known at this time. Sargon Finance SA paid One Million Nine Hundred Ninety-Eight Thousand Two Hundred Sixty Dollars for the creation of various elements of this campaign in an effort to build investor awareness.

The website is actually a tout sheet whereby a third party (Sargon Finance SA) paid almost $2 million "to build investor awareness," or in other words to promote shares of the ZPAS stock to unsuspecting buyers.

It is our opinion that the recent run-up in Zoompass is primarily attributed to this nearly $2 million stock promotion campaign. As we have described in past reports, shares of heavily promoted stocks like Zoompass are temporarily inflated during the promotional campaign and almost always crash in the short term.

22

84.     The connection between Zoompass and CDMG is emphasized by the *Seeking Alpha* article's revelation that the Zoompass Promotional Website was "nearly identical" in form and content to a stock promotion website for Pura Naturals, which similarly had an advertising budget of just under $2 million and was managed by CDMG.

85.     Notably, both Zoompass and Pura Naturals published nearly identical press releases on May 9, 2017 and January 19, 2017, respectively, denying involvement in the stock promotion schemes.

86.     Additionally, the *Seeking Alpha* article revealed that Zoompass and Pura Naturals had similar stock performance following their promotion on their CDMG-managed promotional websites.  The relevant portion of the *Seeking Alpha* article is as follows:

We have found the smoking gun evidence linking Zoompass to another heavily promoted stock, Pura Naturals, Inc. (OTCQB:PNAT), and believe that the two stocks will behave similarly. Specifically, we believe that shares of ZPAS will decline by 50-70% from prevailing market prices similar to the way Pura Naturals traded when its stock promotion campaign topped out.

**Zoompass & Pura Naturals: Nearly Identical Promotional Campaigns**

Zoompass and Pura Naturals have been the subject to promotional campaigns that are so similar in nature that we believe it is not unreasonable to anticipate the two stocks behaving similarly, at least in the short term. For Zoompass, this could mean a sharp decline of more than 50% in the short term.

Below we have outlined three of the most brazen similarities between the two stock promotion campaigns:

*1. Creative Direct Marketing Group*

Creative Direct Marketing Group is an advertising and digital marketing agency located in Southern California that appears to be at least partially responsible for the investor awareness ad campaigns targeting both Zoompass Holdings, Inc. and Pura Naturals, Inc.

In addition to the similar website layouts and domain names used for both the Zoompass stock promotion (Zoompassinvestor.com) and Pura Naturals stock promotion (Purainvestor.com), you can find direct evidence connecting Creative Direct Marketing Group to both stock promotion advertisements.

When you sign up to receive Rick Currin's email newsletter from the Zoompass promotional website, you will notice the originating sender of Rick Currin's email alerts is "mkt@theinvestmentstrategy":

23



Rick Currin <mkt@theinvestmentstrategy.com> Unsubscribe          Apr 28

to me

# Zoompass' (OTC: ZPAS) Disruptive Mobile Technology Could Help You Turn Every $5,000 Invested into $18,475 – or More!

A search of ICANN's WHOIS database reveals that the owner of the "theinvestmentstrategy.com" domain name is Craig Huey, president of the Creative Direct Marketing Group:

*Showing results for: THEINVESTMENTSTRATEGY.COM*
Original Query: theinvestmentstrategy.com

## Contact Information

| Registrant Contact | Admin Contact | Tech Contact |
|---|---|---|
| Name: CRAIG HUEY | Name: CRAIG HUEY | Name: CRAIG HUEY |
| Organization: CDMG INC. | Organization: CDMG INC. | Organization: CDMG INC. |
| Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US | Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US | Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US |
| Phone: +1.3102125727 | Phone: +1.3102125727 | Phone: +1.3102125727 |
| Ext: | Ext: | Ext: |
| Fax: | Fax: | Fax: |
| Fax Ext: | Fax Ext: | Fax Ext: |
| Email:ACCOUNTING@CDMGINC.COM | Email:ACCOUNTING@CDMGINC.COM | Email:ACCOUNTING@CDMGINC.COM |

Creative Direct Marketing Group actually won an award for "Best Investor Relations Online Campaign" for its work with Pura Naturals, Inc. and the ad agency is referenced in the legal disclaimer of the PNAT promotional website:

The principal owner of World Opportunity Investor, James DiGeorgia, received a $7,500 due diligence fee to analyze and evaluate Pura Naturals, Inc. (NASDAQ OTC: PNAT) and $25,000 spokesperson and editorial fee. Creative Direct Marketing Group, Inc. participated in the creation and dissemination of these materials. This report does not provide a professional analysis of a Pura Naturals, Inc. (NASDAQ OTC: PNAT) financial position.

Coincidentally, both Zoompass Holdings and Pura Naturals were subject to stock promotion campaigns with budgets just shy of $2 million managed at least in party by Creative Direct Marketing Group.

87.    The *Seeking Alpha* article went on to detail the fact that Zoompass denied its involvement in the promotional scheme in the Company's May 9, 2017 press release. That press

release was then compared to a similar press release issued by Pura Naturals on January 19, 2017 responding to its own involvement in a stock promotion scheme. The similarities between the two press releases were attributed to the fact that a related party authored both press releases.

88.     The *Seeking Alpha* article stated, in relevant part, as follows:

### 2. The Denial of Involvement

On May 9, 2017, Zoompass issued a press release regarding a promotional newsletter touting the company's stock. Compare Zoompass's press release with the one issued by Pura Naturals on January 19, 2017:

- Zoompass Issues Statement About Promotional Activity Concerning Its Common Stock

- Pura Naturals, Inc. Issues Statement About Promotional Activity Concerning Its Common Stock

The two company-issued press releases above have many sections that are almost identical in context with some areas copied verbatim. The two most likely explanations for these similar press releases is either plagiarism or a related party being responsible for the authoring of both companies' press releases. Based on all of our other findings, we believe the likelihood of the latter is very high.

89.     The *Seeking Alpha* article also noted the similarities of the stock performance for both Zoompass and Pura Naturals following their stock promotion schemes, concluding from their parallel performance that the dramatic increase in Zoompass' stock price was driven by the stock promotion scheme, and that it was in danger of "imminent collapse." The *Seeking Alpha* article thus stated, in relevant part:

### 3. The Chart Patterns

Below is a historical stock chart for Pura Naturals, Inc. for the relevant time period when its stock was subjected to a promotion campaign.



Compare the chart above with the current stock chart for Zoompass and you will notice that to date the charts are nearly identical.

Both stocks were dormant for months and traded at approximately $1.50 per share. Then, all of a sudden, each stock's volume spiked right around the time when promotional newsletter campaigns began surfacing on the Internet. After each stock climbed for about 25 trading days, share prices hit $3.75 and $3.64, respectively. Next, both stocks plummeted by more than 50% before bouncing.

Pura Naturals shares bounced all the way back to $3.45 but failed to break out to new all-time highs. In the 20 trading days that followed, the stock fell by as much as 56%. Although in the long term each company's stock will be more reflective of the successes or failures of each operating business, in the short term, it is our opinion that the stock chart for Zoompass Holdings is driven more by the current promotional campaign than by internal business operations and company news releases. Since the promotional campaign itself along with the stock chart closely resembles the promotional campaign and stock chart for Pura Naturals, we believe that the two will continue to act similar in the short term. For Zoompass, this could mean an imminent collapse of 56% in the short term.

90.     Furthermore, the *Seeking Alpha* article revealed that a reference to "Robert Lee" was made in Pura Naturals' Form 8-K filed on July 26, 2016, and a Reuters company profile named "Robert Lee" as a director of Pura Naturals.  These were preliminary indicators that the "Robert Lee" connected to Pura Naturals was the same person as the "Robert Lee" that is the CEO of Zoompass.  The *Seeking Alpha* article thus stated, in pertinent part:

**Zoompass & Pura Naturals: More Connections Between The Two**
In addition to the resemblances between the stock promotion campaigns subjected to

Zoompass and Pura Naturals, there are also internal examples that demonstrate how the companies themselves may be connected.

*Robert "Rob" Lee*

Robert "Rob" Lee has maintained the position of chief executive officer and director of Zoompass Holdings, Inc. since August 2016. In addition to previously serving as the president and CEO of a company that eventually went into receivership, Lee has "focused on the financing and restructuring of various private entities":

> Rob Lee, Director and Chief Executive Officer: Since 2014, Mr. Lee has served as the Chief Executive Officer and Director of a private financial technology company. He has previously served as the President and CEO of various companies including Versatech Group Inc., a company listed on the NASDAQ and Toronto Stock Exchange up until the late 1990's. Since that time Mr. Lee has focussed on the financing and restructuring of various private entities in a wide variety of industries including manufacturing, construction, mining and retail.

One career endeavor apparently missing from Robert Lee's bio involves an obscure reference to Lee within a share exchange agreement related to Pura Naturals, Inc. found in a Form 8-K filed on July 26, 2016:

> **Item 1.01 Entry into a Material Definitive Agreement.**
>
> *Share Exchange Agreement*
>
> Effective July 18, 2016 (the "Closing Date"), Yummy Flies, Inc. (the "Company") entered into that certain Share Exchange Agreement (the "Share Exchange Agreement") by and among the Company, Pura Naturals, Inc., a Delaware corporation ("PURA") and certain shareholders of PURA (the "PURA Shareholders"). Pursuant to the Share Exchange Agreement, the Company agreed to exchange the outstanding common and preferred stock of PURA held by the PURA Shareholders for shares of common stock of the Company on approximately a 1:4.2 basis, (after giving effect to certain share cancellations). At the Closing Date, Robert Lee, the holder of 8,289,000 shares of common stock, agreed to cancelation of such shares. Other than Robert Lee, shareholders of Company common stock held approximately 1,926,000 shares. Also on the Closing Date, the Company issued approximately 6,267,000 shares of common stock to the PURA shareholders. In addition, shares issuable under outstanding options of PURA will be exercisable into shares of common stock of the Company, pursuant to the terms of such instruments. The shares of PURA common stock issuable upon exercise of options will be exchanged for approximately 470,000 Shares of the Company's common stock, par value $0.001 per share. As of the date of the filing of this Current Report on Form 8-K, the holders of the majority shares of common of PURA have exchanged their shares into a majority of the shares of the issued and outstanding shares of the Company's common stock.

Although we have been unable to reach a representative of Zoompass to clarify Robert Lee's full involvement with Pura Naturals, Inc., a Reuters company profile page lists Robert Lee as being appointed as a director to Pura Naturals in April 2016:

> **Robert Lee**    Mr. Robert Lee is a Director of the Company. Mr. Lee was appointed director in April, 2016. Mr. Lee is an experienced manager and has been the CEO of Paymobile, Inc. since 2014. Previously, he was the CEO of Global Connections Mining from 2010-2012, and concurrently the CEO of Northern Supply, Inc. from 2010-2014 and a partner of Tango Wireless from 2010-2011. From 2000-2007, Mr. Lee was the CEO of Versatech Industries.

In fact, we believe there is a possibility that Robert Lee may in fact also be the chief executive officer of Pura Natural, Inc. under the name Robert Doherty.

91.    The *Seeking Alpha* article also reported a "smoking gun" revelation regarding the connection between Zoompass and Pura Naturals: that Defendant Lee, listed under the name "Robert Doherty," may be the CEO of Pura Naturals.   A person by the name of "Robert Doherty" is also listed in Zoompass' 2016 Form 10-K, seemingly mistakenly as the Company's Director and Chief Executive Officer.   This revelation only emphasizes the fact that Defendant Lee and Defendant Morales were involved in promulgating a promotional scheme that was in breach of their fiduciary duties to investors.   The *Seeking Alpha* article thus stated, in pertinent part:

*Obscure Executive Officer Listed In Zoompass's Annual Report*

Smoking gun evidence connecting Zoompass to Pura Naturals can be seen on page 24 of ZPAS's most recent Annual Report filed on April 24, 2017. In the list of executive officers section, "Robert Doherty" is listed as director and chief executive officer of Zoompass Holdings:

As of December 31, 2016, there were four Named Executive Officers are set forth below:

| Name | Position |
|------|----------|
| Robert Doherty | Chief Executive Officer, and Director |
| Steve Roberts | President and Director |
| Edward (Ted) Yew | Secretary and Director |
| Brian Morales | Chief Financial Officer |

Robert Doherty also happens to be listed as the chief executive officer for Pura Naturals, Inc. in the company's most recent Annual Report:

**Directors and Executive Officers**

The following table sets forth the names, ages and positions held with respect to each Director and Executive Officer of the Company as of the date of this Annual Report.

| Name | Age | Position | Director Since |
|------|-----|----------|----------------|
| Robert Doherty | 56 | Chief Executive Officer and Chairperson of the Board | 2016 |
| Robert Switzer | 53 | Corporate Secretary and Director | 2016 |
| James Kordenbrock [1] | 54 | Chief Executive Officer and Director | 2016 |

**Either there was a highly unusual typo in the Zoompass annual report that mistakenly**

listed Pura Naturals CEO as its own or Robert Lee and Robert Doherty may be the same individual. According to a Bloomberg biography, the chief executive officer for Zoompass Holdings, Inc. is Robert Doherty Lee.

If Robert Doherty Lee is serving dual roles as both the chief executive officer of Zoompass Holdings, Inc. and Pura Naturals, Inc., we believe that investors should remain highly suspicious of the failure to disclose this relevant information in the SEC filings.

92.     Following the publication of the *Seeking Alpha* article, the price of Zoompass common stock fell $0.65 per share, or over 23%, to close at $2.25 per share on May 25, 2017, on unusually heavy trading volume.

93.     On May 26, 2017, Zoompass responded to the explosive report with a non-denial denial, opaquely announcing that it had been "made aware of certain literature and social media content in the market place which contains negative and incorrect information, which the Company has not been asked to clarify nor confirm, promoted by third parties unrelated to the Company."  The Company did not deny the content of the *Seeking Alpha* article other than the article's apparent "mistakes about the management team."

94.     In response, Zoompass took the immediate step of filing an amended 10-K to correct a purported "scriveners error" that the *Seeking Alpha* article exposed as to the identity of the Company's CEO.  The Company clarified that the CEO was Jack Robert Lee ("Rob Lee"). "Mr. Lee has used no other name, and Mr. Lee has been disclosed in the Company's OTC certification dated December 7, 2016, and whose biographical information is disclosed in the Company's 10-K, in previous 8-K filings and on the Company's website."

95.     But, glaring by omission, Zoompass took no other steps to rebut or rectify any other aspects of the *Seeking Alpha* article in the amended 10-K.  Defendant Lee also "urge[d]…investors and future investors…to not rely on promotional materials."  Tellingly, however, neither Defendant Lee nor the Company have denied ***any*** of the substantive allegations

set forth in the *Seeking Alpha* article, with the exception of the contention that "Robert Lee may in fact also be the chief executive officer of Pura Naturals, Inc. under the name Robert Doherty."

96.     Within the next week, Zoompass shares collapsed, dropping from nearly $3 per share to less than $1 per share.

97.     As a result of Defendants' materially false and misleading statements and omissions during the Class Period, and the precipitous decline in the market value of the Company's securities when the truth was revealed, Plaintiff and the other members of the Class have suffered significant losses and damages.

**The Materially False and Misleading Statements Issued During the Class Period**

98.     The Class Period begins on April 24, 2017, when Zoompass filed its 2016 Form 10-K, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016.

99.     In the 2016 Form 10-K, Zoompass falsely stated that the Company "***did not have any promoters at any time during the past five fiscal years***." (Emphasis added).

100.    This statement was false because, within the prior ***month***, Defendants had engaged the services of a promoter to manipulate the price of the Company's common stock.

101.    The Company's 2016 Form 10-K also stated that: (1) "management, with the supervision and participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures" and; (2) "[b]ased upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of December 31, 2016, were effective…"

102.    Additionally, the 2016 Form 10-K contained certifications, signed by the Individual Defendants pursuant to the Sarbanes-Oxley Act of 2002, stating that the financial information contained in the 2016 Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.   The Individual Defendants also represented, through these certifications, that the 2016 Form 10-K fully presented, "in all material respects, the financial condition and results of operations of Zoompass Holdings, Inc."

103.    The statements referenced in ¶¶ 99 - 102 above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Zoompass unlawfully engaged in a scheme to promote the Company's stock; (ii) discovery of the foregoing conduct would subject the Company to heightened regulatory scrutiny and potential criminal sanctions; and (iii) as a result of the foregoing, Zoompass' public statements were materially false and misleading at all relevant times.

104.    Furthermore, the Company's May 9, 2017 press release, issued in response to an inquiry from the OTC Markets regarding promotional materials touting the Company, omits the fact that Defendants were engaged in a scheme created to artificially inflate the value of Zoompass stock.   Accordingly, the statements made by the Defendants in the press release create the false and misleading impression that neither the Company nor the Individual Defendants were involved in the creation or dissemination of the promotional materials when, in fact, the promotional materials themselves disclose that their creator had spoken with Zoompass management.

105.    Similarly, the May 11, 2017 press release issued by Zoompass indicates that the Promotional Newsletter was published by a third party.  Defendant Lee further avoids making accurate disclosures by merely stating that the Company "strongly believe[s] that [its] public disclosures are accurate and complete…  We believe that any increased market interest in our securities in recent weeks is the result of those efforts and disclosures, and not materially elated to any newsletters that may have been distributed by third parties."  These statements also omit that Defendants were actively engaged in the stock promotion scheme, and create the false and misleading impression that the dramatic increase in the Company's stock could be attributed to Zoompass' alleged "progress in effectuating [its] business plan" rather than promotion of the stock through the Promotional Website and the Promotional Newsletter.  Defendants also failed to disclose that they had failed to maintain adequate internal controls.

106.    Finally, as described above, the 1Q 2017 10-Q fails to disclose: (1) the involvement of the Individual Defendants in the fraudulent stock promotion scheme; and (2) the full nature of the Defendants' then-belated acknowledged failure to maintain adequate internal controls.  This failure to disclose was material and both Defendant Lee and Defendant Morales knew or were reckless in not knowing of the Company's involvement in the promotion of Zoompass common stock to unwitting investors.

107.    The materially false and misleading statements referenced above are also set forth in a chart attached hereto as Exhibit C.

## ADDITIONAL ALLEGATIONS OF SCIENTER

108.    Defendants either knew or were deliberately reckless in not knowing that: (i) the statements and omissions alleged above and in Exhibit C were materially false and misleading: (ii) such statements would adversely affect the integrity of the market for Zoompass securities;

and (iii) such statements would deceive investors into purchasing Zoompass securities at artificially inflated prices.

109.   The Company is still in its nascent stages and, as reported in the 2016 Form 10-K, from the date of incorporation through December 31, 2016, Zoompass had generated gross revenues totaling only $284,345 and had incurred net losses of nearly $14 million.

110.   Defendant Lee owns nearly 40% of the Company, giving him a compelling motive to artificially inflate the share price of Zoompass common stock.

111.   Moreover, in April 2016, Mr. Lee was appointed to the board of directors of Pura Naturals.  Later that year, the stock price of Pura Naturals, another company allegedly involved in the exact same type of scheme described herein, was subject to the same scheme described herein.

112.   In addition, upon information and belief and based upon investigation, Plaintiff believes that, after a reasonable opportunity for discovery, he will be able to confirm that either or both of Defendants Lee and Morales worked directly with Rick Currin to promote Zoompass stock.

113.   Furthermore, Zoompass is a small company, with a board of directors and management team comprised of only six people.  Accordingly, Defendants Morales and Lee must have been aware, or were deliberately reckless in not being aware, of the actions that the Defendants were taking to promote the Company's stock.  Especially because of their positions as the CEO and CFO of such a small company, any argument that the surreptitious nature of the scheme creates an equally strong inference that the promotional campaign would have deliberately been kept secret – even within the Company – is hardly reasonable.

114.   Moreover, effective August 22, 2016, the Company assumed an agreement that covers fees paid to a company owned and controlled by Defendant Morales – providing Defendant Morales with yet another motive to ensure the rapid financial growth of the Company at any cost.

115.   The Individual Defendants have also awarded themselves excessive compensation, the majority of which was comprised of stock purchase options, warrants and deferred stock units, where the Individual Defendants could only secure a profit if the market price per share of the Company's stock increased considerably.  Indeed, because the Company is so small, the board of directors "is of the view that it is appropriate for us not to have a standing nominating, audit or compensation committee because the current size of our board of directors does not facilitate the establishment of a separate committee."

116.   Further, the Individual Defendants had a financial motive to maintain the artificially inflated price of the Company's stock while the unvested portion of the equity compensation, including the stock purchase options, vested over time.  Thus, the Individual Defendants had an overwhelming financial motive to increase  and maintain the stock price per share at as high a level as possible for as long as possible, in order to cash in those options and other equity awards as they vested.

117.   The Company was also selling shares immediately before and during the Class Period as set forth above.

118.   There can be no reasonable dispute that Defendants knew and/or recklessly disregarded that the Company was engaged in a stock promotion scheme at the time the 2016 Form 10-K was filed with the SEC.  Therefore, the fact that Defendants published statements that were inaccurate is evidence of scienter.

## NO SAFE HARBOR

119.   The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged herein.  None of the statements alleged herein is a "forward-looking statement" and no such statement was identified as a "forward-looking statement" when made.  Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made.  Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

120.   In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (ii) each such statement was authorized and/or approved by a director and/or executive officer of Zoompass who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.

121.   None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

122.    During the Class Period, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price and operated as a fraud or deceit on purchasers of Zoompass common stock by affirmatively stating that the Company had not used any stock promoters during the five years prior to filing of the 2016 Form 10-K when, in fact, Zoompass and its CEO were involved in a scheme designed to promote the Company's stock.

123.    Once the Defendants' misrepresentations and fraudulent conduct were disclosed to the market, the Company's stock price decreased precipitously.  As a result of their purchases of Zoompass stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss.

124.    The Defendants' false and misleading statements had the intended effect and caused Zoompass stock to trade at artificially inflated levels throughout the Class Period.

125.    As investors in the market became aware of the Company's prior misstatements and omissions, Zoompass' stock price reacted negatively, damaging investors.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

126.    At all relevant times, the market for Zoompass' common stock was an efficient market for the following reasons, among others:

(a)    Zoompass' stock met the requirements for listing, and was listed and actively traded on the OTCQB;

(b)    During the Class Period, Zoompass stock was actively traded, demonstrating a very strong presumption of an efficient market;

(c)     As a regulated issuer, Zoompass filed with the SEC periodic public reports during the Class Period;

(d)     Zoompass regularly communicated with public investors via established market communication mechanisms; and

(e)     Unexpected material news about Zoompass was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

127.    As a result of the foregoing, the market for Zoompass' common stock promptly digested current information regarding the Company from all publicly-available sources and reflected such information in Zoompass' stock price.  Under these circumstances, all purchasers of Zoompass' common stock during the Class Period suffered similar injury through their purchases of Zoompass' common stock at artificially inflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Zoompass securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

129.    The members of the Class are so numerous that joinder of all members is impracticable, since Zoompass has millions of shares of stock outstanding and because the Company's shares were actively traded on the OTCQB.  As of August 21, 2017, Zoompass had more than 41.7 million shares issued and outstanding.  While the exact number of Class

members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

130.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include, *inter alia*:

(a)  whether the Defendants violated the Exchange Act;

(b)  whether the Defendants omitted and/or misrepresented material facts in their publicly-disseminated reports, press releases, and statements during the Class Period;

(c)  whether the price of Zoompass securities was artificially inflated during the Class Period as a result of the material omissions and/or misrepresentations complained of herein; and

(d)  whether the members of the Class have sustained damages as a result of the decline in value of Zoompass' stock when the truth was revealed.

131.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the Defendants' wrongful conduct in a substantially identical manner.

132.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the other members of the Class.

133.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

134.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

135.   This Count, asserted against all of the Defendants, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

136.   During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

137.   The Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)   Employed devices, schemes and artifices to defraud;

    (b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and/or

    (c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Zoompass securities during the Class Period.

138.   The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Zoompass were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflected the true facts regarding Zoompass, their control over and/or receipt of and/or modification of Zoompass' allegedly materially false and misleading statements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Zoompass, participated in the fraudulent scheme alleged herein.

139.   The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Zoompass personnel to members of the investing public, including Plaintiff and the Class.

140.   As a result of the foregoing, the market price of Zoompass securities was artificially inflated during the Class Period.   Unaware of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Zoompass securities during the Class Period in purchasing Zoompass securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

141.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

142.   By reason of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other

members of the Class for the substantial damages they suffered in connection with their purchases of Zoompass securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

143.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

144.   During the Class Period, the Individual Defendants participated in the operation and management of Zoompass and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.   As a consequence of their senior positions, the Individual Defendants knew or recklessly disregarded the fact that the adverse information specified herein had not been disclosed to, and was being concealed from, the investing public. Plaintiff and the other members of the Class had no access to such information, which was and is solely under the control of the Defendants.

145.   As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information about the Company to the investing public, and to correct promptly any public statements issued by Zoompass that had become materially false or misleading.

146.   As a result of their positions of control and authority as senior officers and/or directors of the Company, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that Zoompass disseminated in the marketplace during the Class Period concerning the stock promotion scheme.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Zoompass to engage in the wrongful acts complained of herein.   The Individual Defendants therefore, were

"controlling persons" of Zoompass within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein, which artificially inflated the market price of Zoompass securities.

147. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Zoompass.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

(D)     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: November 20, 2017                    Respectfully submitted,

                                WOLF HALDENSTEIN
                                 ADLER FREEMAN & HERZ LLP

                                By:  /s/ *Correy A. Kamin*
                                    Correy A. Kamin
                                    Matthew M. Guiney (*pro hac vice*)
                                    270 Madison Avenue
                                    New York, NY 10016

Tel: (212) 545-4600
Fax: (212) 686-0114
kamin@whafh.com
guiney@whafh.com

***Counsel for Lead Plaintiff and the Class***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 20, 2017, I electronically filed the foregoing and all related documents with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.


    /s/ *Correy A. Kamin*
    Correy A. Kamin