NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NAYMISH PATEL, *Individually and On Behalf of All Others Similarly Situated*,<br><br>Plaintiff,<br><br>v.<br><br>ZOOMPASS HOLDINGS, INC., *et al.*,<br><br>Defendants. | Civil Action No.: 17-3831 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of a motion to dismiss the Second Amended Complaint filed by Defendants Zoompass Holdings, Inc., Robert Lee, and Brian Morales ("Defendants"). (ECF No. 35). Lead Plaintiff Carlos Guillermo Julian Vega ("Plaintiff") has opposed this motion, (ECF No. 42), and Defendants have replied to same, (ECF No. 43). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, Defendants' motion to dismiss is granted.

## I. BACKGROUND[1]

The Court writes for the benefit of the parties. As the Second Amended Complaint is largely duplicative of the First Amended Complaint ("FAC"), the Court has simply adjusted the

---

[1] The facts as stated herein are taken as alleged in Plaintiff's Second Amended Complaint. (ECF No. 33 ("SAC")). For purposes of this motion to dismiss, these allegations are accepted by the Court as true. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) ("The District Court, in deciding a motion [to dismiss under Rule] 12(b)(6), was required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff].").

1

"background" section from its prior Opinion, (ECF No. 31), making small changes where necessary.

**A. Parties**

Defendant Zoompass is a financial services technology company that has built a platform that helps its customers digitize their financial transactions. (SAC ¶ 21). Zoompass is a Nevada corporation headquartered in Toronto, Canada. (SAC ¶ 16). Zoompass' common stock trades on the "Venture Market" or the "OTCQB," which is one of three financial markets organized by OTC Markets Group, Inc. (SAC ¶ 16). Defendant Robert Lee is the director and CEO of Zoompass and the owner of roughly 38.1% of the company's common stock as of April 18, 2017. (SAC ¶ 17). Defendant Brian Morales is Zoompass' CFO and has served in that role since August of 2016. (SAC ¶ 18).

Plaintiff is a purchaser of Zoompass securities during the Class Period—between April 24, 2017 and May 24, 2017—who purchased those securities "at artificially inflated prices." (SAC ¶¶ 1, 15). Plaintiff brings this putative federal securities class action "on behalf of all persons or entities who purchased or otherwise acquired Zoompass common stock" during the Class Period. (SAC ¶ 1).

**B. Zoompass Stock During the Class Period**

On March 27, 2017, Zoompass stock began actively trading on the OTCQB. (SAC ¶ 44). Shortly thereafter, on April 10, 2017, Currin Technology released a "special high-tech issue" of its technology stock newsletter titled "Wall Street Investor." (SAC ¶ 45). Plaintiff alleges that this newsletter was a paid-for advertisement for Zoompass as opposed to an unbiased analysis of certain technology stocks. (SAC ¶ 45). The newsletter set forth a glowing recommendation of Zoompass stock, for example, stating that Zoompass was "one of the most attractive tech stocks"

of the last 15 years, with the potential to earn investors "270% profits or more." (SAC ¶ 48). A website titled "zoompassinvestor.com" accompanied the newsletter. (SAC ¶ 49). Following the dissemination of the newsletter and the accompanying website, Zoompass shares rose from $1.80 per share to $3.64 per share from April 10, 2017 through May 9, 2017. (SAC ¶ 50).

On April 24, 2017, the date on which the Class Period began, Zoompass filed its 2016 annual financial disclosure statement ("2016 10-K"), which stated that Zoompass "did not have any promoters at any time during the past five fiscal years." (SAC ¶ 58). The 2016 10-K also informed investors that Zoompass' CEO and CFO had looked at the effectiveness of the company's internal disclosure controls and procedures, and that "the price of [Zoompass] common stock may be negatively impacted by factors that are unrelated to [its] operations." (SAC ¶¶ 59–60). Mr. Lee and Mr. Morales signed the 2016 10-K. (SAC ¶ 61). The next day, nearly two million Zoompass shares traded on the OTCQB, the largest volume in Zoompass' trading history. (SAC ¶ 62). Zoompass stock continued to rise steadily through May 8, 2017. (SAC ¶ 64).

On that day, OTC Markets became aware of the newsletter promoting Zoompass stock and so informed the company. (SAC ¶ 65). OTC Markets then labeled Zoompass shares as "caveat emptor," notifying traders that "[t]here is a public interest concern associated with [Zoompass], which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions." (SAC ¶ 66).

Zoompass then issued two statements. The company issued the first statement on May 9, 2017 after the close of the market, stating:

> The Company is unaware of the full nature and content of the promotional newsletter and any related promotional activity, the responsible parties and the extent of the email newsletters' dissemination. The Company is not aware of the promotional materials' author or its affiliated entities or persons, other than the

3

identifying information disclosed in the newsletter. The Company's recent press releases have reported on and provided disclosure of legitimate and ongoing corporate activity only, and are not part of any promotional activities or campaign.

(SAC ¶ 67). Zoompass continued, stating:

After inquiry, the Company states definitively that its officers, directors and, to the Company's knowledge, its controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities), of which there are only two, have not, directly or indirectly, authorized or been involved in any way (including payment to a third-party) with the creation or distribution of promotional materials including the subject newsletter; and that the Company, its officers, directors, and to the knowledge of the Company, any controlling shareholders, have not sold or purchased the Company's securities within the past 90 days on[] the open market. Additionally, the shares currently held by the Company's officers, directors and controlling shareholders are not registered.

(SAC ¶ 68).

Following these announcements, Zoompass' share price fell 45% over three trading days. (SAC ¶ 70). Then, on May 11, 2017, Zoompass publicly acknowledged that OTC Markets moved Zoompass stock from the OTCQB to OTC Pink Current Information, and that OTC Markets had placed the caveat emptor label on the company's stock as a result of the promotional newsletter and website. (SAC ¶¶ 71).[2] The following day, nearly 2.6 million shares of Zoompass stock traded on the OTC Pink Current Information market, which was the second heaviest daily trading volume in the company's history. (SAC ¶ 73). On May 15, 2017, Zoompass filed its quarterly financial disclosure statement ("10-Q") for the first quarter of 2017. (SAC ¶ 74). In its 10-Q, Zoompass conceded that its disclosure controls and procedures were "ineffective." (SAC ¶ 74).

After Zoompass made its two press releases and filed its 10-Q, its shares briefly rebounded until May 25th, 2017, when an article published on the website *Seeking Alpha* "fully and finally exposed and outlined the Defendants' involvement in the scheme to make hidden payments to

---

[2] According to Plaintiff, the OTC Pink Current Information market requires no minimum financial standards and advises investors to proceed with caution as companies listed on that exchange "are not willing or able to provide adequate information to investors." (SAC ¶ 71 n.4).

stock promoters to pump up the price of Zoompass stock." (SAC ¶ 77). After the release of the *Seeking Alpha* article, Zoompass' share price fell over 23% by close of business on May 25, 2017. (SAC ¶ 91). The following day, Zoompass acknowledged that it was aware of the *Seeking Alpha* article and filed an amended 10-K to correct the identity of its CEO, a mistake the *Seeking Alpha* article exposed. (SAC ¶¶ 92–93). Zoompass did not issue any other statements rebutting or denying the information in the *Seeking Alpha* article. (SAC ¶ 94). Over the course of the next week, Zoompass shares plummeted to less than $1 per share. (SAC ¶ 95).

### C. The Alleged False and Misleading Statements During the Class Period

Plaintiff sets forth six statements made by Zoompass or the individual defendants that he believes are material false or misleading statements. (SAC ¶¶ 98–106, Ex. E).

1. In its 2016 10-K, Zoompass stated that it, "did not have any promoters at any time during the past five fiscal years." (SAC, Ex. E (noting that this statement is misleading because it omits that Defendants were engaged in a scheme to artificially inflate the value of Zoompass stock and because Defendants did have a paid relationship with stock promoters at that time)). Plaintiff also argues that this statement "creates the false and misleading impression that fluctuations in the price of the stock were caused solely by dissemination of information related to the Company's finances and operations, rather than promotional advertisements paid for by" Zoompass. (SAC, Ex. E).

2. In its 2016 10-K, Zoompass stated that its CEO and CFO concluded its "disclosure controls and procedures . . . were effective" as of December 31, 2016. (SAC, Ex. E (alleging that this statement is false and misleading because Zoompass later admitted it did not have effective controls and because it created "the false and misleading impression that [Zoompass'] disclosures complied with SEC rules")). Additionally, Zoompass' 2016 10-K

included signed certifications by Mr. Lee and Mr. Morales that were required by the Sarbanes-Oxley Act of 2002 ("SOX"). (SAC ¶ 101). These certifications stated that the financial information in the 2016 10-K was accurate, disclosed any "material changes to [Zoompass'] internal controls over financial reporting," and represented "in all material respects, the financial condition and results of operations of Zoompass Holdings, Inc." (SAC ¶ 101). Plaintiff alleges that these certifications were false or misleading because they failed to disclose that Zoompass was engaged in the stock promotion scheme, and that as a result of that conduct, Zoompass would be subject "to heightened regulatory scrutiny and potential criminal sanctions." (SAC ¶ 102).

3. In its 2016 10-K, Zoompass stated that, "[t]he price of [its] common stock may be negatively impacted by factors that are unrelated to [its] operations." (SAC, Ex. E). Plaintiff notes that this statement is false or misleading because it both omits that the price of Zoompass stock was actually being manipulated by the promotional newsletter at the time the statement was made and further "creates the false and misleading impression that the dramatic increase in the value of the Company's stock was caused by factors related to the Company's operations, [even] though Defendants knew that the Company's stock price had increased as a direct result of their promotional scheme." (SAC, Ex. E).

4. In its May 9, 2017 press release, Zoompass stated that its controlling shareholders, "have not, directly or indirectly, authorized or been involved in any way (including payment to a third-party) with the creation or distribution of promotional materials including the subject newsletter." (SAC, Ex. E). Plaintiff alleges that this statement "omits the fact that at least one . . . of [Zoompass'] controlling shareholders was involved with the creation or

distribution of the promotional materials," and creates the false and misleading impression that Defendants were not engaged in the promotional scheme. (SAC, Ex. E).

5. In its May 11, 2017 press release, Zoompass stated that it "assure[s] the public that all of [its] press releases, SEC filings and information on our website (www.zoompass.com) and the OTC markets profile remains true, correct and complete." (SAC, Ex. E). Plaintiff alleges that this statement is false and misleading because Zoompass' SEC filings were not true, correct, and complete, it ignores Defendants' involvement in the promotional scheme, and it was contradicted by Defendants' later admission that their disclosure controls were ineffective. (SAC, Ex. E).

6. In its May 15, 2017 10-Q, Zoompass stated that after an internal evaluation of its corporate disclosure controls and procedures, its CEO and CFO "concluded that [its] disclosure controls and procedures as of the end of the period covered by this Quarterly Report were ineffective." (SAC, Ex. E (alleging that this statement omits Defendants' involvement in the promotional scheme and their failure to maintain adequate internal controls, while misleading investors into thinking that Defendants had just learned of the inadequacy of those controls when they had known about the deficiencies for over a month)).

**D. The Second Amended Complaint**

On August 8, 2018, this Court granted Defendants' motion to dismiss the Amended Complaint. (ECF Nos. 31–32). In its Opinion, this Court granted Plaintiff leave to amend, despite the PSLRA's narrowed "application of the amendment standard in securities fraud cases," and the Court's intuition that "amendment may well be futile, as Plaintiff ha[d] failed to satisfy the pleading requirements of the PSLRA . . . , and [] ha[d] failed to propose an amendment to the FAC that would satisfy this requirement. (ECF No. 31 at 18). On August 21, 2018, Plaintiff filed the

SAC. (SAC). Attached to the SAC is a redlined copy of the SAC against the FAC. (SAC, Ex. A). The redline shows that the SAC is essentially unchanged from the FAC, with the exception of a new section titled "Additional Allegations Connecting Defendants to the Promotional Campaign." (SAC, Ex. A at 38). This new section alleges a series of facts that compare the promotional activity surrounding Zoompass to the promotional activity surrounding Pura Naturals, a company that Defendant Lee was allegedly also a director of. (SAC, Ex. A ¶¶ 107–134).

## E. Allegations

The allegations in the SAC remain the same. This putative class action asserts securities violations under the Securities and Exchange Act of 1934 (the "Act"). Specifically, in Count I of the Second Amended Complaint, Plaintiff asserts a violation of Section 10(b) of the Act, and Rule 10b-5 promulgated thereunder. In Count II, Plaintiff asserts derivative claims against Defendants Lee and Morales for violation of Section 20(a) of the Act. Defendants now move again for a dismissal of this action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). The plaintiff's short and plain statement of the claim must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

In evaluating the sufficiency of a complaint, a court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cty. of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) (quoting *In re Rockefeller Ctr. Props., Inc.. Sec. Litig.*, 311 F.3d 198, 215–16 (3d Cir. 2002)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555, 557). To that end, a court considering a motion to dismiss must take account of the elements necessary to plead the claims alleged in the complaint.

In this case, Plaintiffs seek relief under Sections 10(b) and 20(a) of the Act. "Section 10(b) prohibits the 'use or employ, in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5, in turn, created a private right of action for investors harmed by materially false or misleading statements to enforce Section 10(b), and it "makes it unlawful for any person '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)).

To establish liability under 10(b) and 10b-5, a plaintiff must show:

> (1) *a material misrepresentation (or omission)*; (2) *scienter, i.e.,* a wrongful state of mind; (3) *a connection with the purchase or sale of a security*; (4) *reliance*, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction

9

causation;" (5) *economic loss*; and (6) *"loss causation,"* *i.e.,* a causal connection between the material misrepresentation and the loss.

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 41–42 (2004) (internal citations omitted).

"Because this is a securities fraud case, . . . [the Court] do[es] not merely ask, as [it] normally would under Rule 12(b)(6), 'whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (quoting *Phillips*, 515 F.3d at 233). This is because the Private Securities Litigation Reform Act ("PSLRA"), applicable to this case, imposes a heightened pleading standard for claims arising under the Securities Exchange Act. *Id.* at 252–53. Specifically, under the PSLRA, a plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (first quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976); then citing 15 U.S.C. § 78u–4(b)(1), (2)).

First, with regard to misleading statements and omissions of material fact, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Further, "[t]o be actionable, [the] statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

Second, as to the scienter requirement, with respect to each alleged wrongful misrepresentation or omission, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). Under the PSLRA, unlike the general rule for pleading fraud under FRCP 9(b), "any

private securities complaint alleging that the defendant made a false or misleading statement must . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Avaya*, 564 F.3d at 253 (quoting *Tellabs*, 551 U.S. at 321).

## III. DISCUSSION

The Court declines to revisit every argument made by Plaintiff and Defendants. To the extent that the SAC mirrors the FAC—and it does almost entirely—the Court directs the parties to its August 8, 2018 Opinion, (ECF No. 31). To the extent that Plaintiff's additional allegations change the Court's prior analysis or raises new issues, both will be discussed below.

As mentioned above, the additions to the SAC concern the parallels between the promotional campaigns directed at Pura Naturals and at Zoompass. The similarities between these campaigns were raised in the FAC as well. As to the import of the comparison, this Court wrote:

> Plaintiff dedicates a significant amount of space in its FAC and brief to the alleged similarities between the promotional campaigns that targeted Zoompass and Pura Naturals. (*See* FAC ¶¶ 84–95; ECF No. 29 at 15, 29 & n.15). These similarities are set out in the *Seeking Alpha* article, which claims that: (1) the promotional websites for Zoompass and Pura Naturals had similar layouts and domain names and were allegedly both connected to CDMG; (2) the companies' press releases concerning the promotional campaigns were "almost identical in context," which could only be explained by plagiarism or the creation of both press releases by one party; (3) both Zoompass and Pura Naturals' stocks had similar chart patterns; and (4) Mr. Lee is a director of Pura Naturals and may actually be the CEO of Pura Naturals under the name Rob Doherty. (ECF No. 27-2 at 5–10).
>
> None of these alleged similarities plausibly establishes that Defendants paid for or even knew about the promotional campaign. That the promotional websites for Zoompass and Pura Naturals had similar layouts and domain names, along with their alleged connection to CDMG, establishes only that it is plausible that the same company created both websites. That CDMG may have been that company establishes no relationship between the promotional campaign and the Defendants. Similarly, Plaintiff's contention that the similarity of Zoompass and Pura Naturals' press releases can be explained only by plagiarism or the creation of both press releases by one party does little to establish that Defendants paid for, or were involved in the creation of, the promotional campaign. Nor does the similarity of

> Zoompass and Pura Naturals' stock chart patterns lend any credence to Plaintiff's theory. The most plausible takeaway from that comparison is that stocks behave similarly when targeted by a promotional campaign, not that Defendants paid for the promotional campaign that targeted Zoompass.
>
> Finally, Plaintiff's contention that Mr. Lee may be the CEO of Pura Naturals under the name Robert Doherty is mere conjecture. The origin of this claim is that Robert Doherty was listed in Zoompass' 2016 10-K as the Company's Director and CEO. (FAC ¶ 91). Zoompass filed an amended 10-K, attributing the mistake to a "scriveners[sic] error" and clarified that its CEO is Mr. Lee, who has not used any other name. (FAC ¶ 94). This scrivener's error, while curious, does not establish that Defendants were involved in the creation of or paid for the promotional campaign. At best, it establishes a plausible connection between Zoompass and Pura Naturals. Even assuming that Mr. Lee was the CEO of Pura Naturals under the name Robert Doherty, Plaintiff pleads no facts establishing that Pura Naturals, or any of its officers, paid for or were otherwise responsible for the promotional campaign that targeted it. Taken to its furthest logical conclusion, Plaintiff has pled instances of two potentially connected companies that were the targets of two nearly identical promotional campaigns that were likely created by the same third-party and financed by one or more additional third-parties. Even interpreting the facts in the light most favorable to Plaintiff, that conclusion does not establish that Defendants were involved with or paid for the promotional campaign.

(ECF No. 31 at 12–13).

Plaintiff argues that the new additions to the SAC, when read in conjunction with the prior allegations, show that Defendant Lee was the director and controlling shareholder of Pura Naturals' predecessor—Yummy Flies—at the time of a stock exchange transaction that was the mirror image of the stock exchange transaction that preceded the promotional campaign targeting Zoompass. (ECF No. 42 at 17). Plaintiff also argues that the Pura Naturals promotional materials explicitly link Defendant Lee to the financing of the Pura Naturals promotional campaign. (ECF No. 42 at 17–18). Defendants argue that this is an inaccurate and incomplete reading of the SAC, and that the documents attached thereto reveal a different reality. (ECF No. 35-1 at 20–23).

The timing of the Yummy Flies/Pura Naturals stock transaction is critical to its relevance to the case at hand. According to Plaintiff, Defendant Lee "was appointed as a

member of the board of directors" of Yummy Flies on April 11, 2016. (SAC ¶ 109). "On that same date, Mr. Lee agreed to purchase enough shares of Yummy Flies to acquire 78% of the total votes entitled to be cast at any meeting of shareholders, giving him voting control of Yummy Flies." (SAC ¶ 109). According to a Pura Naturals form 8-K, Defendant Lee remained the company's controlling shareholder as of July 26, 2016. (SAC ¶ 109). The promotional materials were released on January 17, 2017. (SAC, Ex. F at 2). Plaintiff also points out that the Pura Naturals promotional materials contained a disclaimer stating that the mailing was "a paid promotional advertisement of the featured company, 'Pura Naturals, Inc.,'" and that "a shareholder(s)" of Pura Naturals had paid $1,926,538 for the promotional marketing campaign. (SAC ¶ 113). Plaintiffs allege that, "[b]ecause Defendant Lee apparently held almost all of the shares of Pura Naturals at th[e time of the promotional mailing], it is highly likely that the $1.9 million paid to International Marketing Research, Ltd. by 'a shareholder' of the company came from Defendant Lee directly." (SAC ¶ 115).

When documents are incorporated into a complaint by reference, the Court is entitled to consider them. *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007). When looking at the underlying SEC filings, it is true that Mr. Lee acquired his voting share of Yummy Flies stock on April 11, 2016. (ECF No. 35-3 at 35). Yummy Flies' July 2016 Form 8-K indicates that Defendant Lee's 8,289,000 shares of common stock were cancelled pursuant to a "Share Exchange Agreement," between Pura Naturals and Yummy Flies. (ECF No. 35-4 at 3). Plaintiff argues that the only fair inference given this information in Pura Naturals and Yummy Flies' financial disclosure documents is that Defendant Lee remained the controlling shareholder of Pura Naturals following the share

13

exchange. (ECF No. 42 at 25–27). This is because: (1) the financial disclosure statements "provide *no information* as to what, if anything, Defendant Lee received in return," (2) that this lack of information means that Defendant Lee acquired 78% of Yummy Flies shares and then cancelled his interest in the company for "*zero consideration*," which is "utterly implausible," and (3) "45% of Yummy Flies shares remained outstanding *after* the transaction and the Complaint alleges that 'upon information and belief, Defendant Lee remained as the only controlling shareholder of Pura Naturals after the share exchange.'" (ECF No. 42 at 26 & n.13).

The financial disclosure statements do not support these inferences. The Pura Naturals 2016 10-K does not list Defendant Lee as a shareholder or a director. (ECF No. 35-5 at 28, 34–35). The largest single shareholder of Pura Naturals, according to the 2016 10-K, was a company called AIRTech, which owned 35.39% of Pura Naturals stock. (ECF No. 35-5 at 35). Together with the stock owned by the officers and directors of Pura Naturals, the total percentage of shares owned by these entities was 54.2%. (ECF No. 35-5 at 35). These facts obscure the already cloudy inference that Plaintiff asks this Court to make—that Defendant Lee necessarily funded the Pura Naturals promotional campaign, and, due to the similarities between that campaign and the one targeting Zoompass, Defendant Lee must have also funded or directed the Zoompass campaign. As Defendants correctly note, any combination of the shareholders holding 54.2% of Pura Naturals stock could have been the alleged shareholder who paid International Marketing Research Ltd. to fund the Pura Naturals promotional campaign. (ECF No. 35-1 at 23 n.5).

Plaintiff's remaining new allegations also fail to convince the Court to alter the reasoning in its August 8, 2018 Opinion. First, with regard to the Zoompass promotional

14

campaign, Plaintiff suggests that "various financial maneuverings that occurred around the time the payment was made suggest the initial source of the nearly $2 million payment was Zoompass itself." (ECF No. 42 at 18). Plaintiff believes this conclusion is warranted based on several allegations. First, the Zoompass board of directors "approved the grant of 1,480,000 options to purchase common stock . . . and 460,000 deferred share units to certain directors, officers, employees, *and consultants* of the Company. (SAC ¶ 123). Zoompass also "issued 1,471,659 warrants [to 'certain individuals'] to purchase common stock of the Company," and the expiration date of these warrants "was amended by the Company from November 30, 2016 to March 31, 2017," approximately one week before Zoompass shares began trading on the market. (SAC ¶¶ 124–26).

As Defendants point out, reaching Plaintiff's conclusions based on these allegations requires a fair amount of speculation. (ECF No. 43 at 10). Plaintiff alleges no facts that Sargon Finance—the alleged financier of the promotional campaign—was a consultant of Zoompass. Plaintiff alleges no facts showing that Sargon Finance received either stock options, deferred share units, or warrants. Lastly, Plaintiff alleges no facts showing that Sargon Finance exercised its rights to any of these options, deferred shares, or warrants and then used those options, shares, or warrants to pay for the promotional campaign.[3] These new facts, even interpreted in the light most favorable to Plaintiff, fail to sufficiently establish what the Court found previously lacking: Defendants' involvement with or financing of the promotional campaign.

---

[3] The SAC also alleges that the promotional newsletter was paid for "in the form of securities, rather than cash." (SAC ¶ 128). Plaintiff does not repeat this argument in his brief, and in any event, the promotional newsletter states that "[a]dvertising agencies involved in the campaign received funds for services and no securities." (SAC, Ex. B at 13).

## IV. CONCLUSION

For the reasons stated herein, Plaintiff's Second Amended Complaint is hereby dismissed with prejudice. An appropriate Order accompanies this Opinion.

DATED: January 23rd, 2019

HON. JOSE L. LINARES
Chief Judge, United States District Court